Recovery on March 22, 1933 Mr. Burch Certainly, good morning, your honors. I'm here on behalf of a class of former employees of Bayou Steel who were terminated. You have to state your name for the record. Good morning, your honor. Jason Burge, here on behalf of Troy Fleming and a class of former employees of Bayou Steel who were terminated without notice on September 30th, 2019. The issues in this Warren Act appeal are pretty straightforward. We argue the district court erred by striking our jury demand and then granting a renewed motion for summary judgment, applying a lower standard for summary judgment in a bench trial, and weighing the evidence in favor of the defendants. He also made a key... The right to jury trial, that's a discreet legal issue that we need to decide in this case, right? Correct. It has not been definitively addressed by this court. It has never been definitively addressed by the Fifth Circuit. The Fifth Circuit has affirmed and ruled on cases in which a jury trial was conducted in a Warren Act case, but it's never specifically addressed the issue of whether the Seventh Amendment gives a right to a jury trial in this case. And I want to explain just very briefly why that issue this court has to reach it. What happened in this case is that there were two motions for summary judgment. At the very initiation of the case, defendants filed a motion for summary judgment on this single employer issue. The parties took six months of discovery, we submitted in opposition 101 exhibits and 1,100 pages of evidence and testimony, and the district court specifically found in that we had presented a genuine issue of material fact, sufficient evidence, to have a genuine issue of material fact on four of the five factors. That's in the record at 1537, 1539, 1542, and 1544. And I think that language is important. He didn't just find that there was a reason for the case to go forward. He found we had presented sufficient evidence to create a genuine issue of material fact. So then the defendants took the depositions of the outside directors. They got responses to what I would argue are leading questions. They unquestionably were under objection at the time they asked them, in which each of the independent directors or outside directors said they executed their independent business judgment when they voted to put the thing into bankruptcy. The district court struck the jury demand, and when the motion was re-urged on summary judgment, we responded with all of the same evidence, including some additional evidence, and in fact we incorporated our entire prior opposition. But this time the district court went the opposite way. He said he granted summary judgment, but if you pay careful attention to his findings, what he specifically says twice in that ruling is that plaintiffs have pointed to, quote, inferences created by the record, but those inferences don't create a genuine issue of fact when considered in light of the defendants' responses. What he did the second time was weigh the evidence in favor of the defendants and against the plaintiffs. The standard for a motion for summary judgment is black letter law. The court must make all inferences in favor of the non-moving party, and the court is not supposed to weigh the evidence or make credibility determinations. Here he did that, and he told us why. He said, quote, in a case set to be determined by a bench trial, the court has somewhat greater discretion to consider what weight it will accord the evidence. That's true. That's what our case law says. That is our case law, and that's why the issue about whether we're entitled to a jury trial is the difference between the first time, when he rejected summary judgment, and the second time, when he granted it. And so that brings us to the error, and I think all this court needs to do is look at a very well-reasoned opinion by Judge Oldham from last year in the ERR case, where Judge Oldham laid out in great detail the proper analysis to apply for the Seventh Amendment in a statutory claim. That was the Oil Pollution Act, so it was a different act, but he said there is a two-step test that applies. First, you look at what is the most analogous claim in the courts of England before the merger of the courts of law and equity, and he said the most analogous claim there was a quasi-contract claim. He then said the more important step is the second step, what is the remedy? And although the remedy was restitution in that case, he noted that there is both legal restitution and equitable restitution. And in that case, under the Oil Pollution Act, it was legal restitution because the government wasn't seeking a specific sum of money, it was seeking payment of money damages to compensate for a benefit conferred on the defendant. That is legal restitution, not equitable restitution. That same analysis applies here. What do we do with Pearson, though? I mean, if we conclude that the remedy under the Warren Act is equitable, the district court was right, correct? Well, I would argue that the Warren Act, first, the Warren Act expressly says there are no equitable remedies. Unlike Title VII, unlike a breach of fiduciary duty claim, the Warren Act expressly says the district court has no authority to grant equitable remedies. So that's the first reason. I don't think the court can reach that. But then second, the Pearson doesn't discuss this distinction between legal restitution and equitable restitution at all. It simply says restitution, restitution is equitable. And that's not consistent with this court's ruling in Title VII. And the other thing that the Pearson court does that I don't think makes much sense is it says, well, the most analogous claim is a fiduciary duty claim. Well, one of the few things everybody knows about employment law is that employers typically don't owe fiduciary duties to their employees. Employment is generally at will. So the idea that this claim is a fiduciary duty claim, I don't think that makes sense. I think it's much more sensible to look at what the Eighth Circuit said in Aaron v. Brown, where it noted that the Warren Act, quote, inserts additional terms into covered employment contracts, such that it's most analogous to an action to recover damages for breach of an implied contract. I mean, that is a perfect description of a quasi-contract claim, the exact kind of claim Judge Oldham was looking at in the ERR case, and he said there is a Seventh Amendment. Right. So I know the defendants are going to argue you shouldn't create a circuit split, but I would submit this panel is bound by the prior panel's decision in ERR, and frankly, there already is a circuit split on how to interpret the Seventh Amendment between the ERR decision in the Fifth Circuit and the Pearson decision in the Sixth, and I will note, based on my research, no other circuit has ever followed the Pearson decision. We're bound by ERR, even though that was construing a different statute. I think you're bound by that analysis of the Seventh Amendment. Even though it was construing another statute, I think the way that the Seventh Amendment is construed in the Fifth Circuit, I think this panel has to be informed by the way the ERR panel construed the Seventh Amendment. And a final thought there, I know this is a case in which the employees are seeking to assert their jury trial right, but I will just note the Warren Act cannot only be prosecuted by employees. It expressly can be prosecuted by the government. If this court was to find there is no jury trial in this case, that would mean that defendant employers have no jury trial right if the government comes after them for Warren Act penalties or Warren Act damages. And that is precisely the concern that animated this court in ERR, that in these kind of cases, there should be a jury trial right. Why didn't you sue the fund that owns Bayou Steel? The fund that owns Bayou Steel has no employees, has no assets. The sense that it could be an employer, I think it doesn't have anybody who could do anything. It only acts through its manager, BDCM. And I think if you look at that ownership issue, I was about to turn to those elements so we can start there. I think if we submitted multiple documents in which BDCM itself described itself as the owner, now they say those are inartfully worded documents, but they don't just say we're the owner. They describe how they're the owner. They say, it's page 3262, or 3362, 3363, 3252, they say through our interests in the fund for and BD Holdings 2, Black Diamond Capital Management owns 100% of Bayou Steel. They say in their letters to the outside directors when they're hiring them, Black Diamond Capital Management has the right to appoint or remove directors at any time. That is a right of ownership that they have through their interests in the fund. Who made the decision to close the plant? I believe Black Diamond Commercial Management made that decision. I think we've submitted a lot of evidence that not just the interested directors who were certainly there at the time and participating in the decision were there, but various other Black Diamond employees, including Steve Dekhoff, Ritesh Tanna, Greg Shunk, were intimately involved at the plant at the time this decision was made. And I think more importantly here, there's no evidence of anybody else who made this decision. There's record evidence that this... Did they control Bayou Steel? Did Black Diamond? I believe Black Diamond controlled Bayou Steel, honestly, for about two to three years leading up to the termination. The evidence of that, we submitted about a dozen examples of why that is in the record at 2277 to 82. But when they came in, Black Diamond appointed a CEO. Then they fired him. There's record evidence that Bayou Steel's COO considered one of the Black Diamond managing directors to be the quasi-CEO for the next 18 months. When they finally brought in a new CEO about four months before the terminations, he said he was micromanaged by Black Diamond. He was surprised. And he specifically testified he resigned before the terminations and he learned about them on the news. He did not take responsibility for the terminations and specifically said he didn't order the terminations. The COO said he didn't order the terminations. That's also in the record. The outside directors, this was the factual error the district court made. The outside directors took no vote to place the company into bankruptcy until four hours after the terminations. They specifically testified, this is in the record as well, they were never asked to vote on the terminations. They weren't aware of the terminations. So all of the other decision makers who could have ordered the terminations have specifically testified they did not. And I think a reasonable jury could look at that and could say, well, given that all the other decision makers who would have this power say they didn't order the terminations, we think it was Black Diamond. And I think Black Diamond was there at the time. They had an interest in it. And I believe they did order the terminations. And that really goes, I think, to two different elements. Most importantly, it goes to de facto control. Because I think a reasonable jury could find here, as the district court did the first time, that Black Diamond ordered this termination. But I think also the defendants have introduced this new argument that there's a separate element that we have to show that the defendant ordered the closure. And I think that's exactly what we're arguing. That's what our evidence shows. We believe Black Diamond ordered the closure of this plant. The district court added this additional element that we have to show there was a benefit to Black Diamond from closing the plant. I submit I don't see anything in the Warnack requiring us to show that or in the regulations. But if we did have to show a benefit to Black Diamond to show that the directors were wearing their Black Diamond managing director hats, not their Bayou Steel director hats, amazingly in this case, we have that evidence. Because we have actual emails from the Black Diamond directors describing the fact that they would make a lot more money upon exit if the union was gone. And in the week prior to the termination, we have emails between the Black Diamond directors and his attorneys asking for research about their ability to put the company into bankruptcy and buy it out of bankruptcy without the union contract. It's a very rare case where I have to show evidence of motive. And I have emails showing the evidence of motive. Now, the district court found, well, that's not compelling because what are the odds they would want to do that and put their interest in jeopardy? I think that's a bad economic analysis because I think their loan was already lost at the time the bankruptcy happened. But that again goes to weighing the evidence. We shouldn't be weighing the evidence here. If I can present enough evidence to get this case across the line and create a genuine issue of material fact, we shouldn't be weighing evidence to put it back. That's what a trial is for. And so I guess a couple other quick thoughts. I talked a little bit about common ownership. There are two other elements relevant to the determination. The first one is common directors. And I think here, there's no question that three of the directors of Bayou Steel were also either directors or managing directors of Black Diamond Commercial Management. So that's common directors. But even that was less than a majority, right? That is exactly 50%. And as to the purportedly outside directors, there was testimony and evidence in the record that the people at Bayou Steel thought of the outside director as the eyes and ears and a snoop on behalf of Black Diamond. The outside director himself at page 3413 referred to the fact that, quote, we received good value for Bayou Steel, implying that he was a member of Black Diamond who had bought Bayou Steel. Subsequently, he refers to himself as having both a Black Diamond VC hat, venture capital hat, and a Bayou Steel quasi-CEO consultant hat. That's it. There were no common officers, right? Only to the extent that for a significant period of time, the people at Bayou Steel thought of Phil Regardetzky as the quasi-CEO and he was a managing director at Black Diamond. But no, I think there was never a formally appointed officer of Bayou Steel, but I think there is record evidence that they were effectively run by Phil Regardetzky for a lengthy period of time. And the final issue, the unity of personnel policies, there's this red herring in the brief that, you know, we relied only on a single email to show unity of personnel policies. I think that's simply false. I think if you look at the record, there are dozens of examples we give over the years where Black Diamond has changed salaries, in cutting compensation, in changing the... Why don't you just pick one of those and speak to it as to what it said. Sure. So there is testimony in the record that Black Diamond hired a separate consultant to consider the employee benefits policy, Arthur Gallagher. They met only with Black Diamond employees and they did institute all of those changes. That is in the record at 593. There's also, if you look at that section 2277 to 82, we give dozens of examples of the years, each one with record evidence. This is not just a single email. This is many examples that we believe a reasonable jury could find Black Diamond had an interest in was controlling the employment policy. So with that, unless there are further questions, I'll reserve my time for rebuttal. Thank you, Mr. Bursch. You've saved time for rebuttal. Mr. Stern? Good morning, Your Honors. May it please the Court. Martin Stern for the Appellees, the Black Diamond Defendants. Your Honors, to begin with the jury issue, Judge Smith, you mentioned this issue, Rosanova, in the Fifth Circuit. The answer is yes. This Court has not spoken to whether there's a right to jury under the Warren Act. Counsel suggested there was already a circuit split. That is simply incorrect. Someday . . . No, I think what he said, you and I heard him differently. I thought he said that generally we have a tendency, if it's a close issue, that we might decide not to create a circuit split. In other words, if there's already a case from the Eighth Circuit, that we would go along with that rather than making a circuit split. In that case, I did mishear him. And in fact, I agree with that. In fact, this Court has said on several occasions that it's cherry, that's the word that the Court often uses, it's cherry to create a circuit split, reluctant to do so. And someday, a Warren Act case will be tried without a jury, and the issue will be squarely presented, and this Court will have to make the decision. That is not this case. This case was not tried without a jury. This case was not tried at all. It was a summary judgment case. And the plaintiff's theory of why that is so important is because our first motion for summary judgment was denied. The second was granted. They attribute the sole reason for the District Court granting the second motion for summary judgment that in the interim, the jury had been stricken. But in fact, when you read the District Court's reasons, it becomes, I think, very clear that the reason the District Court granted the second motion for summary judgment was because it satisfied itself about its only concern in denying the first motion for summary judgment, which was whether the three independent directors on the board of Bayou Steel were in fact independent. And between the first motion and the second motion, which was nine months later, those three independent directors were deposed. And they all testified that they did function independently, that contrary to the allegations that had been made, that they were not dependent upon payments from Black Diamond. In fact, their only payments, which were relatively modest, came from Bayou Steel, and that they had all the information they needed to decide to— But the District Court noted that it was no longer a jury trial case. The District Court noted that it had more leeway to consider facts. So they found facts on summary judgment. But then the District Court also said—and I'm looking at page 17 of the court's summary judgment order—therefore, the court finds that although plaintiffs have pointed out inferences created by the record, they've not set out sufficiently specific facts that give rise to more than conclusory allegations. If the court is acknowledging that the plaintiffs have established inferences in their favor, how's the summary judgment order correct? And doesn't that beg the question of whether, then, the lack of jury—lack of jury trial right tipped the balance? So Judge Wilson, two answers. First, while Judge Barbier did note in passing— I mean, he was talking about de facto control there, too, so that's kind of the most important thing under Pearson. And I will get to that. But the first answer is that while the District Court did note that a court has somewhat broader discretion in what weight to give the evidence when it's a bench trial, the District Court also noted the summary judgment standard and applied it, which was that it could not grant summary judgment unless no reasonable jury could rule in the plaintiff's favor. And that was ultimately the basis for the granting of summary judgment here. And the thing I would note here is that I am not here to argue that this summary judgment should be affirmed, applying some, you know, lesser standard. I think that this court should either affirm or reverse the summary judgment. And if it decides that there is—there was sufficient basis to affirm the summary judgment, then this is all a non-issue. There is—this is not the case to create a circuit split with the Sixth Circuit on this issue. To get to the other part of your question, the District Court did note that the plaintiff's entire approach to trying to show de facto control was to try and draw inferences. Now, that had not always been the case. The plaintiffs in this case for some time had actually made allegations that there was—that Black Diamond had made the decision to close the business, to terminate, to lay off the employees. In fact, even in their opening brief in this court, they made that suggestion at page 4 of their brief, but with no citation. They made it later at page 20. And in there, the citation they gave—this is at note 94 of their brief—was to page 3993. They're citing this as the support, the direct factual support, that Black Diamond ordered the closing of the plant or the mass layoff. What is cited there, what is in the record, is nothing but an email between the human resources director of Bayou Steel and Bayou Steel's own employment council. Black Diamond does not appear on that email thread whatsoever. It simply does not— Isn't it true that nobody owns up to who ordered the closure? Well, Your Honor, nobody—that's not completely true. Who did it? I think that the executives— I don't think. Tell me what the record shows. Who did it? So there was a meeting on either September 26th or 27th, and keep in mind at this point, the business, the steel plant, is in dire straits. It's failing. Black Diamond has been pushed by the senior lenders, Bank of America and SunTrust, to put in additional cash. And in fact, Black Diamond obliges at first. It makes a $2 million loan. But the senior lenders who have a priority loan of $41.5 million, they want an $8 million cash infusion from Black Diamond. They're squeezing Black Diamond to put in more money. And Black Diamond does a due diligence. It comes down for two meetings, and then it decides this business is just not going to make it. We're not going to keep making cash infusions into a business that's going to fail. So there's a meeting on September 22nd, and there's a board meeting where the board of Bayou Steel hires bankruptcy counsel and a financial advisor to take it through bankruptcy. Then the executive team for Bayou Steel meets. They all give consistent testimony. It's on September 27th. Some say it's either the 26th or the 27th. This is a Thursday or Friday. And then on the 30th, they close the steel plant, and they lay off the employees. Who closed it? Bayou Steel? Bayou Steel closed it. And what they say happened at the meeting— Did Black Diamond order them to make that termination? No. No, Your Honor. Black Diamond made one critical decision, which was to not continue to make cash infusions into the failing business. Black Diamond did not order the business closed. It did not order a mass layoff. It did not have authority to do those things. And the executives at this meeting that I was talking about on the 26th or the 27th, Mr. Kirkland, the vice president of finance, testified that it was apparent to them at this point that they had no money to buy scrap to make steel or even to make payroll. He testified that he looked at a chart on this date of who would be laid off, specific individuals of who would be laid off. Ms. Barney, who is the human resources director, testified that she had heard from the CEO of Bayou Steel on September 25th to prepare a layoff notice that the business was closing. So, which one of them made the decision? I can't say, but it's clear that the executives are all consistent that they, as the executive team, made the decision. They were planning for the closing. They were planning for the layoff. And critically, they all agree that at this meeting, there was no Black Diamond participation. No Black Diamond participation. The other thing that I want to correct is this suggestion that the independent directors completely disavow having any input into the decision to close the business. In fact, Mr. Archambault, one of the independent directors, testified that he did recall voting to close the business. This is at page 2520 of the record, and then he repeated it at page 2578. Mr. Unfried, one of the other independent directors, did say that he didn't recall a specific vote. I grant them that. But he further testified that it was the decision of the Bayou Steel executives, as we just saw from that meeting. That's at pages 2427 to 28 of the record. He also acknowledged that the decision was inevitable. There was simply no more money to run the business. Everyone knew. I mean, the question of who made the decision is really, it becomes kind of irrelevant in the face of the facts, which is everyone knew once there would be no more cash propping up this house of cards, that it was going to have to close, that it was going to have to lay off its employees. Mr. Taft, the third independent director, the question that he actually answered was that he didn't recall a specific vote on the percentage of employees who would be laid off, but he knew there would be a layoff. This is at page 2387 of the record. What the plaintiffs are really complaining about here, I think in essence, is that Black Diamond did decide to stop making cash infusions. And the plaintiffs' real theory of this case is that because that led inevitably to the closing of the business and the layoff of employees, that Black Diamond should be liable. And you can, in fact, see this in their reply brief at page 26. Their reply brief filed in this case, in this court. They say, BDCM states it was entitled to prepare for a bankruptcy when Bayou Steel's inability to secure additional capital made that result inevitable. But it was BDCM's decision not to deliver on promise financing that rendered it inevitable. That's what they're arguing, that because we made the closing inevitable, that we're liable under the Warren Act. Well, and the truth is, the first priority lenders, I think Bank of America and SunTrust, they had already accelerated their loans or lending or whatever, much bigger amounts, right? That's exactly right, Your Honor. When did that happen? I can't recall. So, they had been put into technical default, but the funding hadn't been cut off by the second. I may have that date wrong. It was earlier in the month. Before this September 27th meeting of the Bayou Steel execs. Exactly. And that's when they were pressing Black Diamond to make an additional cash infusion. The problem with their theory of the case is that it's the same theory that has been made, that has been argued and rejected in case after case. And we cite these opinions in our briefs. There are circuit court of opinions from the Ninth Circuit, Westlock, the Eighth Circuit, Adams versus Erwin Weller, the Pearson case, which is, I think, regarded as a seminal case, the Third Circuit, the Third Circuit, again, an APA transport. In all of these cases, the argument is made that the lender who cuts off further cash infusions should be liable because it's making the closing of the business inevitable. And that it's exerting tremendous control over the business. That it's, as they put it in their brief, micromanaging the business. Well, what these cases say is that that is not a basis for liability under the Warren Act. The Warren Act, the black letter of the Warren Act, this is in Section 2104, provides that a defendant is liable only, quote, who orders a plant closing or a mass layoff. And they say that that was a new argument by us. We argued that in the first motion for summary judgment, cited this court's opinion in Administaff, which gave that textual interpretation to the Warren Act, and we argued it as recently as in opposition to their motion for new trial, specifically citing Administaff, and even pointing out that the plaintiffs had conceded at some point that the critical point in this case was whether we had ordered the plant closing or the mass layoff. But did they contend it was Bayou Steel? I'm sorry, Your Honor? Did they contend it was Bayou Steel that ordered the closing? The plaintiffs have always contended that it's Black Diamond, but they have offered no concrete evidence of that. They've suggested that the court should draw an inference, but there is no plausible basis to draw that inference, given the testimony that I just went through. And, yes, the district court noted that it was being asked to draw inferences, but there was no plausible basis for that inference. And I think the case that is really most on point is the Pearson case, which is a seminal decision by the Third Circuit. In Pearson, it was very similar circumstances. There was a lender that was keeping the business afloat, and the lender, in fact, exercised tremendous control over the business. The lender, in fact, at some point replaced the CEO and every director of the business. And then for three years after that, the lender engaged in helping to run the business, in getting into the details. Why? Because it had so much money on the line. It wanted the same thing the business wanted, to succeed. But they both continued to function as separate businesses. The exact same thing was true here. Then at some point, the lender, in the Pearson case, just made the determination that it was not going to work, that the business simply was not going to succeed. And so the lender made the decision to cease making cash infusions. And the Third Circuit noted here that the lender's own documents show that it made the decision not to refuse further loans, but that its documents actually spoke in terms of liquidating the company. Liquidating the company. There's nothing like that in this case. There have been thousands of pages of documents produced in this case. There is no document that the plaintiffs have been able to point to where Bayou Steel made a decision to liquidate the company. Is there any value to the company if it was liquidated? Well, the company did go through bankruptcy, so there was some value to it, but everybody lost money. The rest of the story in Pearson is important, because the Third Circuit noted that this document from the lender, as the Third Circuit put it, it said, this gives us pause, this is in the plaintiff's favor, that the lender is talking about liquidating the company. Again, nothing like that here. But the Third Circuit still concluded that the summary judgment in the lender's favor should be affirmed. And what it said was, a lender that loans money to a business that's in dire straits, we can't expect it to ignore the consequences of what would happen if it stops making cash infusions, which is the business is going to fail. And the fact that the lender knows that and may be making plans, contingency plans for bankruptcy, doesn't make it the party that closed the business or ordered the mass layoff. It's not enough. And the court even said, we realize we're engaging in line drawing, but that's the business of the court, and we're not going to put a lender who is doing nothing but protecting its loan, protecting its investment, we're not going to put it on the wrong side of the line for liability for the Warren Act, because it acknowledges that what everybody acknowledged in this case, all the Bayou Steel executives, all the directors to a person, that without continued cash infusions, this company was not going to continue. They didn't even have money to buy product to make steel. They didn't even have money to make payroll. Everybody acknowledges that. So what this case boils down to is that argument, is the argument that we should hold, and I'm near the end of my time, and I really want to end with this, because what all of the cases, including Pearson, recognize, is that to hold the lender responsible in these circumstances would be exactly contrary to the purpose that animates the Warren Act, which is to protect workers. And if we interpret the Warren Act so that lenders who decide to stop at some point from making further cash infusions into a failing business, if we hold them liable on that basis, then no lender is going to be willing to help a company in distress in the future. So we ask that the district court summary judgment be affirmed. Unless you have any questions of me, that completes my argument. Thank you, Mr. Stern. Thank you. All right, Mr. Burrage. I think you're going to tell us that Black Diamond was much more than a lender. Well, they unquestionably were, but I'm not just going to tell you that. I'm going to tell you that their auditor, KPMG, told them that. But before I do that, I would just like to say, Mr. Stern is at a bit of a disadvantage in this argument because I have been handling this case from the beginning, and he was brought in on appeal. And so I have a familiarity with the record that perhaps he does not, and I'm sure he did not mean to mislead the court when he said that there was no document in this case talking about liquidation because, in fact, at page 3288 of the record, there is an e-mail exchange between the CEO of Black Diamond and the man he brought with him to evaluate the plant from 10 days before the closure where he says, I lean toward liquidation after a night's sleep. So there is no question Bayou Steel, I mean Black Diamond, was thinking about liquidating this plant. Well, I'm sure they were thinking about it because they were putting a lot of money on the line and they were also evaluating, were they not, putting in more money at that point. Correct. And wouldn't anybody who's a venture capitalist or an investor know that if they didn't put in more money, liquidation was coming just as sure as the sun rises in the morning? At some point when you're a venture capitalist and you own a company, you have to make the decision to give up on your investment. That is a true statement about any asset anybody owns. But the difference between this case and the Pearson case, these other cases he's talking about, really that entire framework he finished with, this is not a lender case. Pearson was a case against GE Capital. GE Capital is a lender. If you look at the other cases, there's cases against American Capital and New Era Capital. These are lenders. This was a company that acquired this business. They bought it. They owned it. They were not the senior lender. They were the subordinated debt. They actually didn't. Their fund did. Their fund did. So it's maybe more attenuated than the lender case. And they didn't make any loans to the company. They will tell you, if he comes back up here, that all the loans were made by Black Diamond Commercial Lending, not by Black Diamond Capital Management, which is a separate entity. But when KPMG audited this company and looked at all of the documents, and this is at record 3384, KPMG said that all of these Black Diamond entities, including Bayou Steel and the commercial finance, they all have common ownership. So if the auditor looking at the company can find common ownership, I don't see why a jury couldn't find common ownership. And that's the difference between this case and Pearson. And if you look at Pearson, what the Third Circuit noted in Pearson was, GE Capital says we're pulling the plug. No more lending. There are then weeks that go by where the management of the company takes last-ditch efforts to find other lenders, to do something, and then ultimately the management of the company at CompTech, it's in the opinion, decides to put the company into bankruptcy. What you have here is, and there is record sites for all of this, all of the relevant people say they did not put this company into bankruptcy. At 1254 and 1255, the CEO testifies. He didn't do it. At 2347, 2388, 2428, the independent directors say they never voted to terminate these employees. The COO at 3088, paragraph 24, he says he didn't. And there was this talk just now about this meeting of the executives on September 26th. You're not going to find any reference to that in their brief. It's not in there at all. It's not in the district court's opinion. What they say in their brief is that the independent director's determination to file Bayou Steel for bankruptcy led to the plant's independent closure. That's on page 26 of their brief. Later in their brief on 41, they talk about how the independent directors made this decision and they weren't controlled by Black Diamond. This idea that there was this meeting that all of the executives have apparently disclaimed in which the executives ordered the termination, there's no record evidence of that, and it's certainly not referenced in their brief. I guess the key here is there's a fundamental factual error in the district court's opinion. The outside directors did not vote to terminate these employees. They did not vote to put the company into bankruptcy until after the terminations happened. So when he says the difference between the first opinion and the second opinion is that the district court got comfortable with the idea that the outside directors were independent, fundamentally that's relevant to some of the elements, and I think a jury could find they weren't independent, but the outside directors did not make this decision. Whether they were independent or not, the outside directors didn't make any relevant decision until after the employees were terminated. That is in the record. They first voted at 1 p.m. on September 30th. Every one of these employees was terminated at 9 a.m. the moment they showed up to work. If you didn't show up to work that day, you got a text message from your buddy telling you, hey, everybody's been terminated. Don't even bother coming back in. So that decision had to be made by somebody other than the independent directors, and for the district court to say now I can grant summary judgment because I'm convinced the outside directors were independent, that's just not relevant to the decision. So with that, unless there are further questions, thank you very much. Thank you, Mr. Burge. Your case and all of today's cases are under submission, and the court is in recess under the usual order.